SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

JOHN FELONI and
STOCK SQUIRREL, INC.,

Defendants.

Case No.

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("Commission" or "SEC") alleges the following as to defendants John Feloni ("Feloni") and Stock Squirrel, Inc. ("Stock Squirrel" and, collectively with Feloni, "Defendants"):

## SUMMARY

1. Between at least 2019 and April 2023, Feloni and Stock Squirrel deceived approximately 180 retail investors into giving them almost $2.5 million. Feloni and Stock Squirrel falsely claimed that they would use investors' money for Stock Squirrel's business, principally by developing a smartphone application ("Stock Squirrel App") offering financial services to the fast-growing youth sector, and they represented that Feloni would not take a salary from Stock Squirrel. Contrary to their representations, Feloni used approximately $1.6 million of investor funds—66% of the total amount raised from investors—to pay his personal expenses and to make other payments with no apparent connection to Stock Squirrel's business. Feloni used the funds he took from Stock Squirrel investors as his primary means of support

throughout the duration of his fraudulent scheme. In return for investors' money, Feloni and Stock Squirrel issued both stock in Stock Squirrel to the investors and promised them returns on their investments as high as 20-24% in short periods via promissory notes.

2. By engaging in the conduct alleged, Defendants violated, and unless restrained and enjoined, will continue to violate, Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 (the "Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder.

3. Based on these violations, the Commission seeks: (a) permanent injunctions; (b) disgorgement of Defendants' ill-gotten gains, plus prejudgment interest; (c) civil penalties; (d) a permanent injunction restraining Feloni, directly or indirectly, including but not limited to through any entity he owns or controls, from (i) participating in the issuance, purchase, offer or sale of any security, or (ii) engaging in activities for purposes of inducing or attempting to induce the purchase or sale of any security; provided, however, that such injunction shall not prevent Feloni from purchasing or selling securities for his own personal account; (e) an order barring Feloni from participating in any offering of a penny stock; (f) an officer and director bar against Feloni; and (g) such other and further relief as the Court deems just and proper.

## JURISDICTION AND VENUE

4. The Commission brings this action pursuant to the enforcement authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

5. The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78aa].

6. Venue lies in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because a substantial part of the acts constituting the alleged violations occurred in Massachusetts, Feloni resides in Massachusetts, Stock Squirrel's principal place of business is in Massachusetts, and Defendants transact business in Massachusetts.

7. In connection with the conduct described in this Complaint, Defendants directly or indirectly made use of the mails or the means or instruments of transportation or communication in interstate commerce. Feloni communicated by mail, email and telephone with multiple investors in Stock Squirrel who reside in states outside Massachusetts.

8. Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## DEFENDANTS

9. John Feloni, age 64, resides in Somerville, Massachusetts. Feloni is the President and CEO of Stock Squirrel and its sole officer and director.

10. Stock Squirrel, Inc. is a Delaware Corporation with a principal place of business in Somerville, Massachusetts. Its principal office is Feloni's residence. Stock Squirrel and its stock are not registered with the Commission in any capacity.

**FACTS**

I.      **Feloni and Stock Squirrel Solicited Investments From
        Retail Investors in Several States.**

11.     From at least 2019 through April 2023, Feloni and Stock Squirrel offered a purported investment opportunity to invest in Stock Squirrel's business, which consisted primarily in the development of the Stock Squirrel App to be released to the public. Feloni and Stock Squirrel claimed on the website they maintained for Stock Squirrel and in communications with investors and potential investors that the Stock Squirrel App's users would be able to purchase fractional shares of stock in public companies when they made purchases from those companies' stores. They claimed on Stock Squirrel's website that, for example, a user could make a $4 purchase at an international coffee roaster chain using a debit card registered with Stock Squirrel, and the Stock Squirrel App would automatically purchase forty cents' worth of fractional shares of the coffee company's public stock.

12.     Feloni and Stock Squirrel solicited approximately 180 investors residing in multiple states, including Massachusetts, Rhode Island, Maine, and Texas, via email and in-person and telephone conversations. Feloni had personal relationships with some but not all of the investors.

13.     In exchange for invested funds (typically ranging from $1,000 to $10,000), Feloni and Stock Squirrel sent investors two instruments: (i) a promissory note signed by Feloni and (ii) shares of Stock Squirrel stock.

14.     The promissory notes typically offered 10% interest payable in six months. The promissory notes also typically provided for a different interest rate of between 18 and 24% annually on any amounts not paid after the due date. Feloni signed the promissory notes, which did not mention Stock Squirrel on their face.

4

15.     The amount of stock each investor received was memorialized in a one-page letter (the "Stock Letter") stating, "as of this date you have a total ownership of [a certain number of] shares of Stock Squirrel, Inc., a Delaware corporation." The Stock Letters further stated, "Physical shares will be issued to you asap, but in the meantime your ownership is official as of today." The letters were signed by Feloni both in his personal capacity and in his capacity as President of Stock Squirrel.

16.     Feloni and Stock Squirrel did not register the offering of Stock Squirrel stock or promissory notes with the Commission. In general, Feloni and Stock Squirrel issued Stock Squirrel stock to investors at a rate of five million shares per ten thousand dollars invested.

**II.     Defendants Falsely Represented That Investor Funds Would Be Used to Develop the Stock Squirrel Business.**

17.     In communications with investors and potential investors, Feloni described the development of Stock Squirrel's business, including its business operations and expenses. In so doing, Feloni expressly or impliedly represented that he would use investors' funds to further develop Stock Squirrel's business, particularly by developing the Stock Squirrel App.

18.     Feloni and Stock Squirrel fraudulently failed to disclose to investors and potential investors, however, that Feloni: (a) intended to use, and in fact used, the majority of investors' funds for personal expenses and other payments with no apparent connection to Stock Squirrel's business, and (b) used money obtained from later investors to pay back earlier investors. Failure to disclose these crucial facts rendered Feloni's and Stock Squirrel's statements materially false and misleading.

19.     Defendants knew, recklessly disregarded, or were negligent in not knowing, that Feloni used the majority of investors' funds to pay for personal expenses and to make other payments with no apparent connection to Stock Squirrel's business.

20. Feloni is the sole officer and director of Stock Squirrel and fully controls Stock Squirrel. Feloni's conduct is imputed to Stock Squirrel by virtue of his control over the company.

21. As described in paragraphs 22 through 27, Defendants made specific false representations to investors and potential investors regarding their use of investors' funds purportedly to develop Stock Squirrel. In all of these communications, Defendants fraudulently failed to disclose that Feloni used the majority of investors' funds for personal expenses and other payments with no apparent connection to Stock Squirrel's business. Multiple people made investments in Stock Squirrel after receiving these communications.

22. On June 19, 2020, Feloni and Stock Squirrel sent a series of emails to a list of investors and potential investors. The emails described several features Stock Squirrel was proposing to implement in the Stock Squirrel App, services it purportedly planned to offer to public companies, and multiple public relations, marketing and law firms Stock Squirrel retained or planned to retain to develop Stock Squirrel's business. On July 17, 2020, an investor who received this email invested $2,000 in Stock Squirrel. On August 3, 2020, another investor who received this email invested $5,000 in Stock Squirrel.

23. Beginning on June 24, 2020, Feloni and Stock Squirrel sent a series of emails to a list of investors and potential investors. The emails attached a document entitled "Stock Squirrel, Inc. Executive Summary Overview," which described Stock Squirrel's business plan and included the following planned expenses:

   a. Building a database of prospective Stock Squirrel App users in order to market Stock Squirrel's services to them;

   b. Marketing efforts such as "Squirrel Fest – an expo on college campuses around the country;"

c.   Retaining several marketing and public relations firms to market Stock Squirrel's products; and

d.   Retaining vendors to develop a "loyalty and reward partner program" to offer to public companies.

On August 14, 2020, an investor who received this email invested $2,500 in Stock Squirrel.

24.   In a July 6, 2020 email to an investor, Feloni claimed, "I'll be putting a lot of money in the tech development."

25.   On December 30, 2020, Feloni and Stock Squirrel sent a series of emails to at least three investors in which they claimed Stock Squirrel would retain a new customer acquisition agency that purportedly had previously worked for a prominent broker-dealer catering to young people and that had extensive experience acquiring young customers. On January 19, 2021, an investor who received this email invested $1,000 in Stock Squirrel.

26.   On December 17, 2022, Feloni and Stock Squirrel sent a series of emails to a list of Stock Squirrel investors and potential investors. In these emails, Feloni and Stock Squirrel claimed to have spent considerable time ensuring that the Stock Squirrel App complied with SEC and other regulations. The emails further claimed that Stock Squirrel would pursue a number of other ventures to develop its business "over the next year or two," including:

a.   Acquiring a broker-dealer firm;

b.   Acquiring a company that offers "carbon credits" to the public that can be used to support environmental sustainability projects;

c.   Developing and offering a range of marketing and investor relations services to public companies;

d. Offering fractional shares in works of art, real property, private companies, and cryptocurrency to investors;

e. Offering services to facilitate donations to charitable organizations;

f. Launching the Stock Squirrel App in India;

g. Opening Stock Squirrel-branded restaurants on college campuses;

h. Hiring a prominent investor and other "influencers of stature" as Stock Squirrel spokespeople; and

i. Partnering with a company owned by another prominent investor to produce investor education videos aimed at schoolchildren.

On December 19, 2022, an investor who received this email invested $10,000 in Stock Squirrel.

27. In approximately January 2023, Feloni met in person with a group of investors and prospective investors in which he represented that he did not take any salary from Stock Squirrel. During this discussion, Feloni continued to represent that investors' funds would be used to develop Stock Squirrel's business, particularly by developing the Stock Squirrel App. On January 23, 2023, an investor who was at this discussion invested $10,000 in Stock Squirrel.

### III. **Feloni Misappropriated Investors' Funds for Personal Use.**

28. From 2019 through April 2023, Feloni and Stock Squirrel raised approximately $2.5 million from investors. Feloni also received approximately $350,000 from other sources during this period. Most investors made their investments by writing checks payable to Feloni. Feloni instructed these investors to make their checks payable personally to him rather than to Stock Squirrel. Feloni deposited these checks into his personal bank accounts. Some investors also made their investments with cash, which Feloni deposited into his personal bank accounts. Other investors made wire transfers directly to Feloni's personal bank accounts.

29. Several investors referenced in the memo line of their checks that their funds were for investment in Stock Squirrel. For example:

a. On March 18, 2021, an investor wrote a check to Feloni for $5,000 with a memo line stating, "Stock Squirrel 2.5m shares common stock."

b. On March 26, 2021, an investor wrote a check to Feloni for $5,000 with a memo line stating, "Stock Squirrel common stock 2.5m shares."

c. On May 1, 2021, an investor wrote a check to Feloni for $10,000 with a memo line stating, "Stock Squirrel Investment."

d. On February 23, 2022, an investor wrote a check to Feloni for $5,000 with a memo line stating, "Stock Squirrel Investment."

e. On May 9, 2022, an investor wrote a check to Feloni for $5,000 with a memo line stating, "Stock Squirrel Shares."

f. On January 11, 2023, an investor wrote a check to Feloni for $1,000 with a memo line stating, "Stock Squirrel Shares."

30. During the period that Feloni and Stock Squirrel took in investor money, Stock Squirrel's finances were fully commingled with Feloni's personal finances. Stock Squirrel held no active bank accounts in its own name and did not (and does not) hold any other assets in its own name.

31. During this period, Feloni and Stock Squirrel did not maintain any records concerning Stock Squirrel's financial condition or the expenses paid in the course of Stock Squirrel's business, other than Feloni's personal bank account statements. Feloni and Stock Squirrel also did not maintain records of the principal or interest that remained outstanding on the promissory notes issued to investors.

9

32.     Of the $2.5 million received from investors, Feloni used approximately $1.6 million for personal living expenses or other expenses with no apparent connection to Stock Squirrel's business. For example:

a.     Feloni took approximately $1 million through cash withdrawals or by writing checks made out to himself. Approximately $116,000 of the cash withdrawals were made at ATMs located at casinos in New Hampshire and Massachusetts.

b.     Feloni deposited $287,000 into brokerage accounts in his personal name that he used to trade stocks and stock options.

c.     Feloni paid more than $594,000 for personal living expenses or other expenses with no apparent connection to Stock Squirrel's business, including:

i.     $92,000 for Feloni's personal rent;

ii.     $111,000 for Feloni's personal food and dining;

iii.     $23,000 for Feloni's personal liquor store purchases;

iv.     $23,000 for Feloni's personal health care and wellness expenses;

v.     $20,000 for Feloni's personal insurance payments; and

vi.     $56,000 for Feloni's personal retail purchases, including purchases at stores selling cigars, jewelry, electronics, and sporting goods.

**IV.    Defendants Induced Some Investors to "Roll Over" Their Investments.**

33.    Beginning on November 13, 2020, Feloni and Stock Squirrel sent emails to certain investors in order to induce them to "roll over" their promissory notes, thereby postponing Feloni's obligation to pay.

34.    The emails contained misleading statements that did not disclose that Feloni had used the majority of investors' funds for personal expenses and other payments with no connection to Stock Squirrel's business, including:

    a.    A November 13, 2020 email claiming that Feloni wanted investors to roll over their promissory notes because "I'm using a lot of cash for the engineering" of the Stock Squirrel App.

    b.    A November 17, 2020 email claiming that Feloni wanted investors to roll over their promissory notes because he claimed to be "in crunch time on the one-yard line to get the [Stock Squirrel App] launched in January," emphasizing, "cash is king."

35.    Multiple investors rolled over the promissory notes they received in response to Feloni's requests. Some investors who rolled over their promissory notes also received additional shares of Stock Squirrel stock.

**V.    Defendants Used Incoming Funds from Later
Investments to Pay to Existing Investors.**

36.    Feloni and Stock Squirrel used approximately $242,000 of new investor funds to repay some or all of the principal of approximately 25 existing Stock Squirrel investors who demanded to be repaid in accordance with the terms of the promissory notes they received.

37.    Many of these investor repayments were Ponzi-like in nature. On multiple occasions, Feloni and Stock Squirrel deposited a check from a new investor into one of Feloni's personal bank accounts with a low, and sometimes a zero or negative, balance. He then issued a

check from that account shortly thereafter to repay a previous investor in an amount that was higher than the total balance of the account before the deposit of the new investor's funds. For example:

a. On October 24, 2022, Feloni deposited an investor's check for $10,000 into a bank account in his name with a prior balance of $204.69. One day later he issued a check for $6,000 to partially repay a previous investor;

b. On November 4, 2022, Feloni deposited an investor's check for $25,000 into a bank account in his name with a prior balance of $21.33. Three days later he issued a check for $4,000 to partially repay a previous investor while also cashing several checks made out to himself with a total value of $11,500; and

c. On December 9, 2022, Feloni deposited an investor's check for $15,000 into a bank account in his name with a prior balance of $101.03. Three days later he issued a check for $6,000 to partially repay a previous investor.

## **FIRST CLAIM FOR RELIEF**

### **FRAUD IN THE OFFER OR SALE OF SECURITIES**

### **(Violations of Section 17(a) of the Securities Act)**

38. The Commission repeats and incorporates by reference the allegations in Paragraphs 1-37 above as though fully set forth herein.

39. By reason of the foregoing, Defendants, directly or indirectly, acting intentionally, knowingly, recklessly, or negligently, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities: (a) have employed or are employing devices, schemes, or artifices to defraud; (b) have obtained money or property by making untrue statements of material fact or omitting material

12

facts necessary to make the statements made not misleading; or (c) have engaged or are engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon the purchasers of such securities.

40. By reason of the conduct described above, Defendants have violated, and unless enjoined will continue to violate, Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

## FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES

## (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder)

41. The Commission repeats and incorporates by reference the allegations in Paragraphs 1-37 above as though fully set forth herein.

42. By reason of the foregoing, Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail: (a) have employed or are employing devices, schemes, or artifices to defraud; (b) have made or are making untrue statements of material fact or have omitted to state material fact(s) necessary to make the statements made not misleading; or (c) have engaged or are engaging in acts, practices, or courses of business which operate as a fraud or deceit upon certain persons.

43. By engaging in the conduct described above, Defendants have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**THIRD CLAIM FOR RELIEF**

**UNREGISTERED OFFERS AND SALES OF SECURITIES**

**(Violations of Section 5(a) and 5(c) of the Securities Act)**

44.     The Commission repeats and incorporates by reference the allegations in Paragraphs 1-37 above as though fully set forth herein.

45.     By virtue of the foregoing, Defendants, directly and indirectly, without a registration statement in effect as to that security: (a) made use of the means or instruments of transportation or communications in interstate commerce or of the mails to sell securities through the use or medium of any prospectus or otherwise; (b) carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; and (c) made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

46.     By their conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) and 77e(c)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission requests that the Court:

A.      Enter a permanent injunction restraining Defendants and any persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of a similar purport and effect,

14

in violation of Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), e(c), and q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

B.      Enter a permanent injunction restraining Feloni, directly or indirectly, including but not limited to through any entity he owns or controls, from (i) participating in the issuance, purchase, offer or sale of any security, or (ii) engaging in activities for purposes of inducing or attempting to induce the purchase or sale of any security; provided, however, that such injunction shall not prevent Feloni from purchasing or selling securities for his own personal account;

C.      Require Defendants to disgorge their ill-gotten gains, plus prejudgment interest, pursuant to Exchange Act Sections 21(d)(3), (5), and (7) [15 U.S.C. § 78u(d)(3), (5), (7)];

D.      Require Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

E.      Order that Feloni be prohibited from acting as an officer or director of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

F.      Order that Feloni be barred from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

G.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

H.      Grant such other further relief as the Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

By its attorneys,

David London

David H. London (BBO# 638289)
Martin F. Healey (BBO# 227550)
David R. Fox (VSB# 93500)
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
(617) 573-8997 (London)
LondonD@sec.gov

Dated: September 29, 2023